We'll hear argument today in case 17-965, Donald Trump, President of the United States v. Hawaii. Mr. Francisco. Mr. Chief Justice, and may it please the Court. After a worldwide multi-agency review, the President's acting Homeland Security Secretary recommended that he adopt entry restrictions on countries that failed to provide the minimum baseline of information needed to vet their nationals. The proclamation adopts those recommendations. It omits the vast majority of the world, including the vast majority of the Muslim world, because they met the baseline. It now applies to only seven countries that fall below that baseline or had other problems, and it exerts diplomatic pressure on those countries to provide the needed information and to protect the country until they do. The proclamation reflects a foreign policy and national security judgment that falls well within the President's power under 1182-F and has been successful, which is why the country of Chad was recently dropped from the list. But it You mentioned 1182-F, and the worrisome thing about this is that the President Congress is the one responsible for making the laws about immigration. It has been suggested in one of the briefs that we read 1182-F to allow the President to suspend entry, but only for a period of time long enough for Congress to say yea or nay. Your Honor, yes, 1182-F is a broad and flexible power in a narrow area. Here, however, I think that you don't need to explore those outer limits because the proclamation is meant to help implement the INA by making sure that we have the minimum level of information needed to determine if aliens are admissible under the INA. In terms of a time limit, I think that's simply inconsistent with the text of the statute and inconsistent with virtually every 1182-F proclamation ever issued. Here we have a I'm sorry, Mr. General. I thought that Congress had looked at this situation and created a statutory system that addressed the very concern the President is expressing. Congress said you can have visa waivers if you can meet the three criteria that this special committee of the President looked at. And if you don't, you have to have a very heightened extreme vetting process. And it created that vetting process and suggested its parameters. More importantly, it took terrorist countries and designated which ones supported terrorism and added another layer of review and said if you're a national from one of those countries or you have visited one of those countries in the recent past, you also have to get the permission of the Attorney General and the Secretary of State to affirm that you are not a danger to the U.S. But what I see the President doing here is saying I'm going to add more to the limits that Congress set and to what Congress said was enough. Where does the President get the authority to do more than Congress has already decided is adequate? Well, there's a lot packed into your question, Your Honor. And so let me try to unpack it a little bit. I think the basic answer is that 1182F gives the President the authority to impose restrictions in addition to those set forth in the INA. It might, but on the very grounds that Congress has already looked at. And that's exactly what I was going to address next, Your Honor. The Visa Waiver Program provides a special benefit to our closest allies and some of the safest countries in the world. Neither the Visa Waiver Program nor any of the other statutes that they cite addresses whether we get the minimum level of information needed to determine the admissibility of individuals coming in from some of the riskiest countries in the world. And 1182F then does give the President the authority to supplement that vetting system. After all, the whole vetting system is essentially determined by the executive branch. It's up to the executive branch to set it up. It's up to the executive branch to maintain it. And it's up to the executive branch to constantly improve it. And here you have something that really is at the core of 1182F, since its main purpose is to help implement the INA by making sure we have that minimum baseline of information. And if you look at the proclamation, what we're talking about is very basic pieces of information. Not the ideal, but the minimum. Are they reporting terrorism history information? Are they reporting criminal history? Do they cooperate with us on a real-time basis? And I could give you an example to help illustrate how this works. Suppose that Jane Doe shows up at our border with a valid visa. But after that visa was issued, pursuant to the entire process, Your Honor, that you described, her home country learns that she is associated with a terrorist organization, but doesn't tell us. When she shows up at the border, we cannot make an intelligent determination as to whether or not she's admissible under the INA. And that's what this proclamation really does go to, making sure we have that minimum baseline of information needed to determine admissibility. And so the proclamation really does reflect a – it is different than past proclamations, but it is typical in the sense that it seeks to identify harmful conduct that a foreign government is engaging in, and then it imposes sanctions in order to pressure that government to change. That's what President Carter did with respect to Iran, what President Reagan did with respect to Cuba. Here, the harmful conduct is the failure to provide us with that minimum baseline of information. Can you represent that no other country that fails all three of the criteria was excluded from this list? Well, Your Honor, what I can represent is that the analysis was holistic. It wasn't if you failed any one or the others. It was if your overall score was sufficiently low. So I can represent that all of the countries listed in the proclamation are the same countries that fell below the baseline, with the exception of Somalia, which the proclamation makes quite clear, and the exception of Iraq, which did fall below the baseline but was not subjected to sanctions. And I think that this reflects the tailored nature of this proclamation. And the fact that it was meant to impose tailored pressure on these countries while also taking into account other types of national security and foreign policy considerations to try to move those countries across the line into acceptability, which we've now seen has been successful, as with the case of the government of Iraq, of Chad. If you compare this proclamation to the Reagan and the Carter proclamations, which I think were one or two sentences, this is longer than any proclamation that I've seen in this particular area. This is, Your Honor, the most detailed 1182- I say longer detailed is a better word. Yes. This is the more detailed 1182-F proclamation in history. General, the proclamations by Reagan and Carter, however, were not as broad as this one. Your Honor, they were almost as broad, but to complete my answer to Justice Kennedy's question, this is the most detailed proclamation ever issued in American history. Yes, Your Honor, to be sure, this covers more countries than either President Reagan's or President Carter's covered. But it's- And more immigrants, because Carter's only applied to certain immigrants, not to all. President Carter's actually applied to all immigrants, but then had an exception, much like the waiver provision here, for national interests and humanitarian concerns. So I think President Carter's was actually very similar to the proclamation here. Is your counselor non-reviewability argument, is that a jurisdictional argument? Your Honor, yes, I think it is a jurisdictional argument, and that's why I don't think you really should address any of these issues. The basic rule is that the exclusion of aliens is a political act imbued with foreign policy and national security concerns, and therefore subject to- But I thought in Sale that we decided that this wasn't jurisdictional, or at least decided the merits despite the non-reviewability argument that the government made. I think the second thing that you just said, Mr. Chief Justice, is accurate. The Court didn't address the reviewability issue at all, and so we don't think it's precedential one way or another. Was the argument raised in that case by the government? Yes, it was, Your Honor. So it's an argument we would have been required to address if it were, in fact, jurisdictional. I think so, and so I think one way you could understand it is that it doesn't go to Article III jurisdiction, though it is a justiciability argument, and we would urge this Court to accept it because we think it's correct. But even if you don't think that it's correct, we think that this proclamation satisfies the merits because it does fall well within the power of the President under 1182F. May I turn, General, to the constitutional claims in this case? Yes, Your Honor. And your principal response to the Establishment Clause claim is to cite Mandel and to say that once the government comes forward with a legitimate reason, of course, national security is the most important reason one can come forward with, the game is over, essentially. And I just want to press on that a little bit. Sure. So first I want to ask whether that means you started off by talking a lot about the process of this proclamation, but I take it that that argument would apply irrespective of what process was used. In other words, you would have made the same Mandel argument to the first executive order in this case, or would you not? We would have made a Mandel argument, but it is far stronger, given that you have the process and substance upon which this proclamation was based. Well, I guess I wonder why that is, just because when I read Mandel, I don't see anything about process or you have to meet a certain kind of bar. Mandel really is kind of you state a reason and this Court stops. And I think that that is right, but I think that when you, in addition to that, have the extensive worldwide process that we had that resulted in a Cabinet-level recommendation that applied a neutral baseline to every country in the world, concluded that almost all the world, including almost all of the Muslim-majority world, passed that baseline, but a tiny number of countries didn't, I think that whether you apply Mandel or whether you apply McCreary, that makes the constitutional case in our favor overwhelmingly strong. So let me give you a hypothetical, and it's just, you know, I think that there are ways to distinguish Mandel in this case, but, you know, just in terms of thinking about what Mandel really forecloses there. And I, because Mandel, there's only two cases in the area, and it's hard to understand the full contours of it. I agree. So this is a hypothetical that you've heard a variant of before that the government has at any rate, but I want to just give you. So let's say in some future time, a president gets elected who is a vehement anti-Semite and says all kinds of denigrating comments about Jews and provokes a lot of resentment and hatred over the course of a campaign and in his presidency. And in the course of that, asks his staff or his cabinet members to issue recommendations so that he can issue a proclamation of this kind. And they dot all the I's and they cross all the T's. And what emerges, and again, in the context of this virulent anti-Semitism, what emerges is a proclamation that says no one shall enter from Israel. Right. Do you say Mandel puts an end to judicial review of that set of facts? No, Your Honor. I don't say Mandel puts an end to it, but I do say that in that context, Mandel would be the starting point of the analysis because it does involve the exclusion of aliens, which is where Mandel applies. If his cabinet, and this is a very tough hypothetical that we've dealt with throughout, but if his cabinet were to actually come to him and say, Mr. President, there is honestly a national security risk here and you have to act, I think then that the president would be allowed to follow that advice, even if it's in his private heart of hearts he also harbored animus. I would also suggest, though, if I could finish that, Your Honor, that I think it would be very difficult for that to even satisfy Mandel rational basis scrutiny. I don't need to know what the rationale was. Given that Israel happens to be one of the country's closest allies in the war against terrorism, it's not clear to me that you actually could satisfy Mandel's rational basis standard on that, unless it truly were based on a cabinet-level recommendation that was about national security. General, this is an out-of-the-box kind of president in my hypothetical. We don't have those, Your Honor. And he thinks that there are good diplomatic reasons. And who knows what the future holds, that there might be good diplomatic reasons to put pressure on Israel or to say we want Israel to vote a certain way in the UN and this is a way to better our diplomatic hand. And so this is what he does. And who knows what his heart of hearts is? I mean, I take that point. But the question is not really what his heart of hearts is. The question is what are reasonable observers to think given this context in which this hypothetical president is making virulent anti-Semitic comments. Right. And, Your Honor, it's a tough hypothetical, but it's why I also think that this is a relatively easy case because we're willing to even assume for the sake of argument that you consider all of the statements. And we're even willing to assume for the sake of argument, though we think that it's wrong, that you applied some kind of domestic establishment clause jurisprudence because we're quite confident that given the process and substance that form the basis of this proclamation, no matter what standard you apply, this proclamation is constitutional. Since we don't have the extreme hypothetical that you're suggesting, Your Honor, we do have a multi-agency worldwide review and a cabinet-level recommendation that applied a neutral baseline. And this wasn't done just by the cabinet secretaries but by the agencies to every country in the world. Mr. General. If you have that extreme hypothetical, would that present a free exercise or an establishment clause claim or both? It could definitely present a free exercise clause challenge, Your Honor, just as you had a free speech-type claim in the Mandel case. And there would be people who could bring that claim and who could potentially succeed on that claim. And the people that could bring that claim, I assume, were relatives of people that were excluded, a father, son? On free exercise, potentially, I think. What about a university? I think a university could bring a free speech-type claim under Mandel much less. Why not an establishment clause claim? Because, Your Honor, and the reason why I think they haven't pursued those types of claims is because I don't think they would possibly support the types of nationwide injunction that they're asking for. Your Honor, the reason why I don't think that they could bring an establishment clause claim is because the proclamation doesn't actually apply to the respondents. It only applies to aliens abroad who have no constitutional right to enter. No, but the claim is that it – that the proclamation is in place because of a dislike of a particular religion. And I thought the establishment clause, at its heart, is that we cannot be anything but neutral with respect to religion or its practice. That is true, Your Honor. But as the Valley Forge decision makes clear, not everybody has standing to challenge that negative message injury. Otherwise, the plaintiffs in Valley Forge would have had standing to challenge the land transfer from the government to the Christian college on the ground that it sent a pro-Christian or anti-atheist message. But these people are saying that that negative religious attitude is stopping them from doing things that they would otherwise be able to do, to associate with scholars from these countries, to bring in students, to have family members join them, which is one of the purposes of the INS. And that's where they might have free exercise or free speech claims along the type that Justice Kennedy suggested, but which couldn't support a nationwide injunction. I don't think that that gives them an establishment clause claim when the proclamation doesn't actually apply to them because — Sotomayor, today, can we go back to something that's been bothering me here, which is — and it was argued in a case this week about the unitary executive theory, which basically says the President is at the head, I think — I'm summarizing in an incomplete way — but that the President is the head of the executive branch and that he should have, for those who are in the extreme of this theory or on one end of the theory, not extreme, that he can hire or fire anyone he wants and that he can put in place whatever policy he wants. If we take Justice Kagan's hypothetical president, who basically says to his review committee, I want to keep out Jews, period. Find a way. That's their charge. So in that situation, why would the actions of the committee, whatever this is, the executive committee, not be subject to great suspicion and to thorough review, which actually wasn't completely done here, given that they are responsible to the executive and they've been told what the outcome of their deliberations must be? Sure. And I have two responses to that, Your Honor. The first is that the President's Cabinet, just like all of us here, is duty-bound to protect and defend the Constitution. So I would expect that if any Cabinet member were given that order, that Cabinet member would refuse to comply or resign in the face of a plainly unconstitutional order. So I think that would be the initial check. Secondly, if you had an extreme scenario where all of that broke down, then if the President actually did make that statement, I want to keep out a particular race or a particular religion no matter what, that would undermine the facial legitimacy of the action, even under the Mandel standard. Here, however, you don't have anything like that. Rather, you have the Cabinet doing its job through the agencies, where they ask the agencies to construct and apply this neutral standard to every country in the world, including every Muslim country. They concluded that the vast majority of the world, including the vast majority of the Muslim world, was just fine, but there were problems with a small number of countries and so imposed pressure, recommended pressure, to help move those countries across the line. Sotomayor General, the problem is that I don't see that that material was reviewed by the judges below, by the Ninth Circuit or the Fourth Circuit judges. I thought that the government had kept confidential and refused to share, either with the litigants or the courts, exactly what was done, how, what the evaluation and how it was applied to all those countries in the world. I understand some of the confidentiality that might concern you, but if the anti-Semitic background, don't you think that once you get through the Mandel preliminary stage, that you need an independent arbiter to look at all of that to ensure the process, in fact, is what is claimed it was? Well, Your Honor, a couple of responses to that. First of all, I think that the proclamation is very transparent and lays out in great detail both the process and the substance upon which the proclamation is based. And I think that under the duty of regularity or good faith or whatever you want to call it, that one branch of the government owes to another co-equal branch of the government, there is a very strong presumption that's what is being set out there is the truth. You said something earlier, General, and I want to make sure that I got it right. You said if at the time the President had said we don't want Muslims coming into this country, that that would undermine the proclamation. Yes. Did I get you right? Yes. So I think, you know, honestly, the difference here then seems to be is everything that the President said effectively that. I think there are two issues, Your Honor, there. The first is whether you can ever consider things like campaign statements. And we are very much of the view that campaign statements are made by a private citizen before he takes the oath of office and before, under the Opinions Clause of the Constitution, receives the advice of his Cabinet, and that those are constitutionally significant acts that mark the fundamental transformation from being a private citizen to the embodiment of the executive branch, so that those statements should be out of bounds. Suppose you have a local mayor, and as a candidate, he makes vituperative, hateful statements. He's elected, and on day two, he takes acts that are consistent with those hateful statements. Whatever he said in the campaign is irrelevant? Your Honor, if he takes the same oath as I did. Whatever he said in the campaign is irrelevant? I would say two things. And that was the – and the second thing is the point I was about to turn to. I would say yes, because we do think that oath marks a fundamental transformation. But I would also say here, it doesn't matter. Because here, the statements that they principally rely on don't actually address the meaning of the proclamation itself. This is not a so-called Muslim ban. If it were, it would be the most ineffective Muslim ban that one could possibly imagine, since not only does it exclude the vast majority of the Muslim world, it also omits three Muslim-majority countries that were covered by past orders, including Iraq, Chad, and Sudan. And so this order is what it purports to be, and what its process and substance confirms that it is. It is an order that is based on a multi-agency worldwide review that applied neutral criteria all across the world, and concluded under those neutral criteria, most of the world was fine, but a small part of it failed to provide us with that minimum baseline of information, the minimum, not the ideal, the bare minimum, terrorism history, criminal history, that we need to protect the country. All right. Can I ask a more — I did read, I think, almost all the 80 briefs. Now, your time. Yeah, don't worry. Please, go ahead. All right. All right. Almost 80. And I think I'm somewhere repetitive, not too many. And I think I know the basic arguments. But there's one question I'm left with, and it starts with an assumption, which I think you share, but I want to be sure. All right. I noticed that the Carter order and the Reagan order both had case-by-case exceptions. And I looked at this order, and this has case-by-case exceptions. And then it says, you know, it says case-by-case waivers may be appropriate in individual circumstances, such as, giving some examples, the following. And then they have to be no terrorists. Well, that's the law anyway. And they have to be in the interest of the United States. And there can't be undue hardship, which the only time that the word hardship appears in the immigration law is it says extreme hardship. So undue must be less than extreme. Okay? Then they have a list of people with foreign contacts, previously established, business reasons. They've been here studying or other long-term activity. They want to visit or reside with a close family member. They have a disease or something that they need treatment for. They have previously been employed. And there are about five other things. All right. Focus on that class of individuals. Now, in countries of 150 million people altogether, there must be quite a few who have, do fall within that class. Well, yes, Your Honor, but there's only a small number of people that seek to come into our country. Well, that's what I'm asking about. You see, that's now, if you think, now, as far as we're concerned, if they fall within that class, there's no reason given here why they should be excluded other than the normal processes. Well, a couple of responses, Your Honor. First, in terms of the numbers. I'm not asking about the numbers. Oh, you're not asking. I don't want to ask about the numbers. So in terms of the reason they should be excluded, one of the principal purposes of the proclamation is to exert diplomatic pressure on governments in order to get them to change and provide us with the new information. So you think they should be excluded? Not if they meet the criteria for the waiver. Not if they meet the criteria. Okay. Okay. That's why we have the waiver. That's what I thought you would say. Yes. Then I can ask my question. Sorry. But I want to be sure you were on the same wavelength. Yes. Okay. Now, falling within that class, here is the problem. It seems to me that there are probably a significant number of such people. I mean, you read the briefs. You think, hey, there's the business community complaining. There's the academic community. There were 46 scholars at Harvard. There are families in the Lisa Blatt brief, you know, that they say we were trying to get medical treatment, and nobody told us about this, and you've only admitted two, and there's supposed to be guidance, and you haven't put in the guidance. That's not true. And the most there are is 100. And so there is my question. If you have done the same thing that the Reagan people did and the Carter people did, then it might be, I'm not expressing a definite opinion, but, well, you got the same thing here. But if this is, as one brief says, just window dressing, and they never apply it, then you have something new and different going well beyond what President Reagan did. Okay. So I want to know how do I find out, or how do I find out when there is not that information in the brief? Do we have to, can we have another hearing? Do we send it back? Do we say, look, the government, of course, thinks this isn't window dressing, but the other side says there are only two people, no notice, nobody knows, there are people in Yemen, there are people in Somalia, decent people, business, you see my point? Yes. And two responses. Our reply brief has our most current number on waivers, and I believe the number at page 17 footnote, well, it's over 400. I can't remember. That's 400 out of 150 million? And is it well publicized in these countries that they know all they have to do is go to the visa office and say, I understand the thing, I want an exception? Your Honor, I have two responses to that. One is, I don't know how well publicized it is, but I suspect that people understand how to get it. My second principle response is, though, that, frankly, in terms of the legality, I think that the waiver is not necessary, although it is a very good thing. Not necessary. There you have it, President Reagan. Which is why most governments don't, which is why it's a good thing, which is why most of these proclamations often have them, but there's nothing in the law that  Okay, so you want me to consider, that's what you want. You want me to consider the lawfulness of this order on the assumption that there is no waiver. I don't. Which is not what President Reagan did, not what President Carter did. And if you go through every action that Congress took, waiver, waiver, waiver, possibility, case by case, case by case, that's the answer. The answer to your question, Your Honor, is no, I don't want you to consider the proclamation on the hypothetical situation that it is what it isn't, but I do think that the proclamation as written and as applied falls well within the President's authority under 1182F. Thank you, Mr. Chief Justice. Thank you, General. We will afford you rebuttal time. Thank you. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. The executive order is unlawful for three reasons. It conflicts with Congress's policy choices. It defies the bar on nationality discrimination, something you never heard my friend talk about. And it violates the First Amendment. Congress has already specified a three-part solution to the very same problem the order addresses. Aliens seeking entry from the United States. Aliens seeking entry from countries that don't cooperate with the United States in vetting, including, quote, state sponsors of terrorism and countries that provide inaccurate information. First, aliens have to go through the individualized vetting process with the burden placed on them. Second, when Congress became aware that some countries were failing to satisfy the very same baseline criteria you just heard about that the order uses, Congress rejected a ban. Instead, it used carrots. When countries cooperated, they'd get extra credit, a faster track for admission. Legislation used big sticks like nationality bans failed. And third, Congress was aware circumstances could change on the ground, so it required reporting to them so it could change the law. Well, let's take big sticks fail. Let's suppose that the intelligence agencies go to the President and say, we have 100% solid information that on a particular day, 20 nationals from Syria are going to enter the United States with chemical and biological weapons. They could kill tens of thousands of Americans. In that situation, could the President ban the entry of Syrian nationals on that one day? He could for two reasons. You know, there's two different arguments. There's the nationality discrimination ban, 1152. And then there's a, you know, whether or not this comports with Congress's policy judgments. And with respect to both, I think it would. It wouldn't be nationality discrimination for the reasons Judge Sentel said in Lavasse when you have an emergency, fast-moving situation like the Syria example you're saying. Roberts. Well, just to stop and interrupt you there, I mean, what if it's a week? What if it's a week, a month from now? That's what the intelligence information is. In other words, I'm trying to respond to your point that it has to be an immediate decision. So I think, you know, this Court's dealt with that in Youngstown and Hamdan and said, look, you know, the President's going to get a pass absolutely on, you know, what he says the emergency is. But the ultimate question is, can you go to Congress and get any legislative impediment removed? And that he can have deference about. But here we are, 460 days on or later, Mr. Chief Justice, he's never even introduced legislation about this. So we're so far from that hypothetical. We'll concede that hypothetical. Imagine if you can that Congress is unable to act when the President asks for legislation. And someone introduces a bill saying let's authorize. First of all, the President may have qualms about sharing that absolute intelligence broadly. But let's say there's a bill introduced to say let's authorize the President and there's a bill introduced to say let's block the President and neither bill moves. Absolutely. We understand the President will have residual authority to keep the country safe. Our point here, though, is that Congress has thought about this exact problem, including, you know, about there's only one problem he's identifying, which is countries not cooperating. He's not talking about people coming in or something like that, like your hypothetical. And with respect to that, Congress has said, here's how we deal with it. We deal with it with the individualized vetting system, which pushes all the burdens on a person coming in. That's 1361. You've got to show biometric ID under the statute. You've got to have an in-person interview. If there's any risk that the person is from a country that's a state sponsor of terrorism, like your hypothetical, or anything else. So Congress has really said in a robust way, here's how we deal with it. And to the extent countries aren't cooperating, we offer carrots. Congress rejected exactly what they're trying to propose here, which is a flat nationality ban. And that's where I think the force of our argument lies with respect to the first point, which is this is countermanding Congress's policy judgments. My friend on the other side actually has been. But Congress did act. It enacted 1182F. Correct. Why doesn't this fall squarely within the language of 1182F? We have both textual reasons that it's not a class, for reasons Justice Breyer was talking about. It's not perpetual. It's perpetual, like Justice Ginsburg was talking about. But we think there's a much bigger point, Justice Alito, which is — Well, maybe you could talk about the text. It's not a class. Doesn't 1182F say whenever the President finds that the entry of any aliens — Correct. — or any class of aliens. So put class aside, although I don't really see why people who are nationals of a particular country don't constitute a class. What about any aliens? Right. So we think it is — because the power in 1182 is so broad and sweeping and does allow the President to supplement what Congress has done, we think that you have to be careful and read — you have to read it just the way you read every other statute to say, how do we harmonize that broad text of 1182F with the rest of the INA? And our point in our briefs, which I don't think you heard an answer to, is if you accept their idea that the President has such a sweeping power, he could end, for example, the family preference system and impose — you know, and so-called chain migration or anything like that. He could do — countermand any of the provisions of the INA and turn it into a line-item veto. So for that reason, we think there has to be some limit. That's something this Court's dealt with in, you know, the tobacco case. Well, does this proclamation do anything like that? Does this proclamation purport to establish a new permanent immigration policy for the United States? Absolutely, Your Honor. This is a perpetual policy that bans. It does exactly what Congress in 1965 said you can't do. And it countermands Congress's fine-grained, reticulated judgment from 2001, 2015, and several other times, which is to say, instead of these flat bans, we're going to have — we're going to balance foreign policy considerations, economic considerations, like the U.S. Company's brief, humanitarian, image of the United States views, all of that together, and said, we won't do the flat ban. Instead, we're going to have a much more fine-grained approach with individualized betting and carrots for the countries that don't — What is your basis for saying that it is perpetual? Well, there's nothing in the order that ends it. And you heard my friend say, oh, that would doom all executive orders. But that's not true. I thought it had to be reexamined every 180 days. No, that's not what it says. It says there's a report that has to come in at 180 days, and nothing happens at the end of the report. Well, that indicates there will be a reassessment. Well — And the president has continuing discretion. Justice Kennedy, this argument wouldn't be there if there was anything about reassessment the way there are in about half the orders, including the Cuba order, which says it sunsets once the crisis ends. There's nothing like that in this. And it's just like a reporting requirement to Congress, in which Congress isn't necessarily required to do anything. Congress has statutes like that all the time. This is that. And that's why this is unlike any other executive order. If you go back and look at all 43 executive orders that presidents have issued, none of them have even arguably countermanded Congress's judgment in the area. They've all been consistent. They've all been supplements. Well, the statute says for 1192, for such period as he deems necessary, and he can have continuing supervising over whether it's still necessary. Again, we wouldn't have a problem with that if it was tailored to a crisis as it sunsets and then, you know, could be re-upped or something like that. That's not what this says. This is about a perpetual problem. So you want the president to say, I'm convinced that in six months we're going to have a safe world. Well, no, Justice Kennedy, that's not our argument. Our argument is here the president is identifying something that is a perennial problem. Our brief says it goes back 100 years. You know, when the Soviet Union was around, we don't have countries that cooperate with us in vetting. And the solution has always been from Congress not to have a flat ban, but instead to have a fine-grained vetting system to balance these considerations. What if the military advisers tell the president that in their judgment the president ought to order a strike, an airstrike against Syria? And the president says, well, does that mean he can't because you would regard that as discrimination against a majority Muslim country? Absolutely not. There's nothing to do with the text of the statute. The 1152 statute is about discrimination and the, quote, issuance of visas. And that's all that — So under 1182-F you would say that there's no problem under that provision? Well, under 1182, as I understood, it was a strike. And so I don't think there's any immigration issue in your hypothetical. I might be misunderstanding it, Mr. Chief Justice. Well, any type of targeted action that would have an impact on the Muslim population. Absolutely. We think the president has wide authorities to do things that have impacts on the Muslim population, take the laptop ban. Why, under your theory, wouldn't that constitute or the argument would be that that's discrimination under your Establishment Clause argument, that that's discrimination on the basis of faith because he has said in the past, if you accept the arguments, that he is anti-Muslim? Not at all, Your Honor. No president has run afoul of this, you know, and that's because here the president and his advisers have directly tied this policy to those statements. And the red brief at page 70, I think, is the greatest illustration of that. That's a constitutional claim, and I certainly want to get there. But before doing so, I just want to make very clear the consequences of their position for the INA is that the president can take a wrecking ball to the statute and countermand Congress's fine-grained judgments. Mr. Kuchel, if I might, on the statutory question before we leave it. We've been proceeding so far on the assumption that we can reach the merits, but the government makes the argument, for example, that aliens who are removed from this country have to bring their claims personally, and third parties can't vindicate those rights of aliens who are present in this country, and asks the question why it should be that third persons should be able to assert the rights of aliens who are not present in this country. What's the answer to that? Well, several. This is not a third-party case. These are United States citizens bringing this challenge in a state of the United States. On behalf of aliens not present in the country. Well, they are directly harmed themselves. Let me just give you one example, not just the state of Hawaii, whose universities directly impacted, but let's just take, for example, Mr. Alamari, the 10-year-old in the PARS Equality Brief, Justice Breyer, that you're referring to. This is a 10-year-old daughter in Yemen who is trying to come here because she has certain qualifications. I understand that, but those arguments don't work with respect to aliens present in the country. So why do they work for aliens who are not present in the country? Because I think — Those very same arguments would not succeed. Well — I think you'd concede that they wouldn't succeed for aliens present. Right, and they don't succeed because there you have a better plaintiff who might not be willing to bring them in the United States, and that's why the court, you know, says no third party. But here, these folks are directly impacted. And the most important thing to say is SAIL answers this. You heard my friend concede SAIL was jurisdictional. The issues in SAIL, that's how they briefed it up. That's how he just described it. This court had exactly that situation, United States plaintiffs, and it reached the merits. Our statutory point to you is that if you accept this order, you're giving the president a power no president in 100 years has exercised, an executive proclamation that countermands Congress's policy judgments. He has zero examples to say that when Congress has stepped into the space and solved the exact problem, that the president can then come in and say, no, I want a different solution. If you do that, it's not just family preferences that you're allowing him to get rid of. You'd get rid of all sorts of even small things in the code or big things, like there's a preference for specialty occupations, like software engineers in the INA. The president could say, the economics are such, I'm going to ban software engineers from going to California, or something like that, under that sweeping 1182 power. Kagan. I guess the question, though, Mr. Katyal, is maybe you're entirely right that 1182F needs to have some limits to prevent the president from doing something that's completely contrary to another section of the statute. But you're suggesting, well, the president can't do anything that's not contemplated by the rest of the statute. That is not our. Okay. So then I want to know, what are you saying this is directly contrary to? Because it seems to me you would have to point to some kind of clear and direct conflict between what the president is doing and another statutory provision. So our view is that the president can supplement. He just can't supplant. And this Court's decisions in the Brown and Williamson case and the UARG greenhouse gas and Concepcion and Abilene Cotton, the savings clause cases, all say there are three things you look at. And it's not a flat bar. It can't be like a direct contravention. Even they say it's not a direct contravention in their reply brief at page 19. So the three things are, first, can these two solutions coexist or not? Second, has Congress prescribed a reticulated comprehensive scheme? And third, you know, is there any other indication that Congress considered the issue and went in a different direction?  Satisfies all three of those factors. Congress has a comprehensive reticulated scheme that deals with the exact single problem that he's identified, which is countries are not cooperating. It can't coexist with the solution of a flat ban. It makes no sense, for example, to have the in-person visa interview, which is in 1202H2, which is for people who come from state sponsors of terrorism or who have a, quote, group with a likelihood of providing inaccurate information. Congress said there has to be an in-person interview for that. It doesn't make sense to say, well, you're going to have a flat ban. It doesn't make sense to have a visa waiver program, which is all about countries that provide zero information to the United States, state sponsors of terrorism and the like, and say, we're going to give you a caret, and then say, oh, no, forget about the visa waiver program. Can you imagine any situation in which the threat of the infiltration of the United States by terrorists was so severe with respect to a particular country that the other measures that you have mentioned could be deemed by a president to be inadequate? Yes. I cannot imagine any such situation. Yes, I can, and the president would have a robust authority to deal with that. That is not our argument. And your argument is that courts have the duty to review whether or not there is such a national insurgency. That's for the courts to do, not the president. No. I think you have wide deference, Justice Kennedy. It's exactly what you said when you joined Justice Breyer's opinion in Hamdan, which is as long as presidents have wide berth in this area, but certainly if there's any sort of emergency, that precludes it. But when you have a statute that considers the very same problem, and there's nothing new that they've identified in this worldwide review process that Congress didn't consider exactly the same types of things, it is a perennial problem that countries do not cooperate with the United States when it comes to vetting. That's in the abstract. I mean, they may have more – the president may have more particular problems in light of particular situations developing on the ground. And, yes, Congress addressed the question of the adequacy of vetting. But those questions arise in particular contexts. And it seems to me a difficult argument to say that Congress was prescient enough to address any particular factual situation that might arise. And that's, again, Mr. Chief Justice, not our argument. So, for example, if something came along like a virus that wiped out the visa processing software in all these other countries, absolutely the president would have the power to do it. But here – What about a change of administration in a particular country? Yes. In which perhaps the vetting procedures are not going to be taken seriously. Right. That Congress could not have anticipated. Well, but, again, Congress anticipated a country that is a, quote, state sponsor of terrorism. And even with respect to that, providing no information and, indeed, fomenting against the United States, Congress said, oh, we're not going to have a nationality ban. You know, they flatly banned that. And said we're going to have individualized vetting and this visa waiver program caret to try and deal with that, you know, dangerous regime. Now, again, I can imagine an emergency situation in which the president would have even greater authority for that. But here we are, 460 days later, and I would caution the court not to make a decision about the emergency you're concerned about. That can be bracketed as it was in Youngstown, as it was in Hamdan. This is so far from that. The text of 1152 is flatly violated here. It says there shall be no discrimination on the basis of nationality with the exception of visas. That is 39% of all the visas this executive order covers. It's not a small part. It's a large part. And it is the most important part because immigrant visas are the kind of heart about, you know, what the nation becomes. It's people who want to come here and become part of our long-term polity. This executive order flatly contradicts that. Now, if you accept his interpretation, he says, well, you know, we're discriminating at the entry side, not at the visa side. If you do that, you are giving the President the power to undo. And he's actually just done it. He's undone the ban on nationality-based discrimination. He's imposed country quotas of zero for these countries at the border. Roberts. If your argument based on discrimination, based on the campaign statements, is there a statute of limit no, the one that you do make based on the campaign statements, is there a statute of limitations on that, or is that a ban from presidential findings for the rest of the administration? So, Mr. Chief Justice, I first want to be very clear about this. Our point about 1152 and the discrimination has nothing to do with any campaign statements or anything else. It's purely the text of the proclamation, which is nationality-based discrimination through and through. Judge Sentel said you couldn't imagine a clearer text than this, and this is – it violates it. Now, you're asking about the First Amendment. I just want to make absolutely clear that we're – that's not – you know, you don't need to do any of that for purposes of 1152. And that would knock out 39 percent of the most important part of the executive order. My question, of course, was not on 1152. Okay. With respect to that, we don't – we think that the test, as this Court has said, a reasonable, objective observer viewing all the statements. And we think, absolutely, my friend is right. You shouldn't look to campaign statements in general or stuff like that, at statements of a private citizen. The only thing is here, they themselves, the President and his staff, have rekindled exactly that. If you look at page 70 of our red brief, you have a very good example of this. After the executive order, this latest executive order was promulgated, the President tweeted these three virulent anti-Muslim videos. And then the press spokesman was asked, what does this mean? What is this about? And the answer was the President has spoken about exactly this in the proclamation. My question was whether or not the inhibition on the ability to enter one of the proclamations applies forever. No. I think the President could have easily moved away from all of these statements. But instead, they embraced them. That's the difference. And so, absolutely, the President would have wide berth to say that's it. So if tomorrow he issues a proclamation saying he's disavowing all those statements, then the next day he can reenter this proclamation? That's exactly what this Court said in McCreary. This Court in McCreary said, you know, the same policy can be constitutional if promulgated by one entity and not by another, depending on the circumstances around it. Is your answer to my question yes? Yes. Tomorrow he issues a proclamation disavowing those statements. Absolutely. And the next day he can reenter this, and your discrimination argument would not be applicable. And, Mr. Chief Justice, that's exactly what I told the Ninth Circuit in May. The President didn't do that. That's what's the, you know, that's what a reasonable objective observer says. Mr. Katyal, would any reasonable observer reading this proclamation, without taking into account statements, think that this was a Muslim ban? I mean, there are, I think there are 50 predominantly Muslim countries in the world. Five countries, five predominantly Muslim countries are on this list. The population of the predominantly Muslim countries on this list make up about 8% of the world's Muslim population. If you looked at the 10 countries with the most Muslims, exactly one, Iran, would be on that list of the top 10. So would a reasonable observer think this was a Muslim ban? If it were just the text of the order alone, it might raise eyebrows for fit and other reasons that the briefs go into, but we wouldn't be here. We absolutely agree that it's the same test as in Lukumi and other cases. You have to look to all the circumstances around it that are set, the publicly available ones. You know, and Justice Alito, the fact that the order only encompasses some Muslim countries I don't think means it's not religious discrimination. For example, if I'm an employer and I have 10 African Americans working for me and I only fire two of them, I don't think, you know, and say, well, I've left the other eight in. I don't think anyone can say that's not discrimination. No, I understand that. And it is one of our fundamental values that there is religious freedom here for everybody and that adherents to every religion are entitled to equal treatment. My only point is that if you look at what was done, it does not look at all like a Muslim ban. There are other justifications that jump out as to why these particular countries were put on the list. So it seems to me the list creates a strong inference that this was not done for that invidious purpose. Justice Alito, I think if it were just the list, I think you'd be right, although I'd point out that you yourself in the Storman's case said that it raises an inference of religious gerrymander of, quote, the burden imposed falls almost exclusively on those with religious objections. This is a ban that really does fall almost exclusively on Muslims. Between 90.2% to 99.8% Muslims. And so it does look very much like what you said in Storman's. But even then, we wouldn't be here if it weren't for all of the different statements. And the best evidence of this about what a reasonable objective observer would think is to look at the wide variety of amicus briefs in this case from every corner of society representing millions and millions of people from the U.S. Conference of Catholic Bishops, which calls it, quote, blatant religious discrimination. It's been a long time since this court has used lemon test reasonable observer even to strike down a domestic statute, let alone something with purely international application. What do we do about that? Yeah, so two things. Number one is I think the very fact that this is immigration cuts the other way. I mean, the heart of the First Amendment is about immigration restrictions on, for example, Catholics at the founding and our protest of King George, which is all about using the immigration power to exclude people of a different faith. And that's what our Constitution is about. So that's the first thing. And the second is we don't think you have to get into lemon and all these other tests that you all have struggled with. I think this court in Lukumi was very clear in saying that when you're talking about denigration of religion, all the tests point in the same direction. Mr. Kuchel, you said something earlier. You said you wouldn't be here if all of those statements, the background statements, were not made. Do you mean that on all of your bases? You wouldn't be here on the Establishment Clause claim? Only on the Establishment Clause claim, not on anything else. And our point is, you know, he talks about, for example, this worldwide vetting process. Remember his own argument on 1182 as the statute puts the President. So let's go back to not being here without the statements. Clearly the statements, even conceded by your adversary, do give you a basis to look behind, all right, the reason. So if we're looking behind it, how do you deal with the General's suggestion that there was a cleansing that occurred because of all of the agencies and departments who participated in this process? Yeah, so there's three things. Number one is that his own argument is that 1182 puts the President in the driver's seat. So the Cabinet's not important. It's the President's proclamation. Second, the order itself says in its first lines, it harkens back to Executive Orders 1 and 2, and it says it's an outgrowth of that. So it was infected by the same thing that was struck down on Establishment Clause grounds in other cases. And third, and most importantly, the President, before this review process even began, tweeted and said that he wanted a tougher ban, a non-politically correct ban, and the like. So given all of those things, but particularly given the fact that 1182 itself forces the President to make the proclamation, it's the President's proclamation. So I don't think you even have to get into this whole unitary executive thing. But I do agree with you, Justice Sotomayor, that that's another problem, which is they're coming before the Court and saying, nope, it's the President who's in charge. And now they're saying here, oh, no, no, no, it's these other people. This is the President's proclamation through and through. No President has ever said anything, anything like this. And that's what makes this different. And the President would — And yet, Mr. Katyal, you have a proclamation that says there are important national security interests at stake. And the question is how to do the kind of analysis that you want us to do without, in some sense, evaluating the adequacy of those national security interests, which, for the most part, we've said courts are not equipped to do. Right. So we're not asking you to second-guess a national security judgment at all with the purpose of the Establishment Clause. We're saying you just have to look to what a reasonable objective observer would do. That's the ordinary test that you've used in cases like Lukumi. Is there an official purpose to disparage a religion? Here, there very much is. That's, you know, everything that the President has said and that the order itself embodies. That's our fundamental problem. It's still something I'm thinking about, perhaps to the side. But the statutes you point to, one of the ones that is stronger for you. There are obviously objections to what you're saying in quite a few briefs. All right. But the one that you talked about, it does say you have to have an interview with a counselor official if the person is from a country officially designated by the Secretary of State sponsor of terrorism. It does say that. So they'll say, but we do have that in respect to everyone under the exception. So there isn't much problem. We've gone beyond that in respect to other people. All right. Take their argument for a moment, because my question is, which I couldn't find in the briefs, is, is it true, I'm just taking what they say, that really that isn't so? They don't publicize it. They haven't put forth a guidance. People don't know they can come in and qualify for this. And if it turns out that that is something that is important to the lawfulness of the order, because there are many, many categories there, what do we do? So two things. Number one, this waiver process has excluded, and you have this in the PARS Equality Brief at page 14, a 10-year-old with cerebral palsy who wants to come to the United States to save her life, and she can't move or talk. The 10-year-old was denied a waiver, Justice Breyer. He says there's 430 people who've gotten waivers. They've never told you the denominator, and there's no publication of this process and how often it is. And the data that we do have suggests, as a matter of percentages, it's very weak. Just to give you some evidence of that, just the state of Hawaii has gotten about 1,000 letters from people, most of which say we're not even getting waivers and the like. We've heard very few examples. That raises a question of remedy for me. We have this troubling rise of this nationwide injunction, cosmic injunction, not limited to relief for the parties at issue or even a class action. And near as I can tell, that's a really new development where a district court asserts the right to strike down a federal statute with regard to anybody, anywhere in the world. What do we do about that? Obviously, the injunction here has been trimmed by this court itself and others. And I do think, I share your impulse, Justice Gorsuch, that's something that I think lower courts are debating right now in a number of different contexts, like the contraception case and the like. I think this case is the poorest example to get into it because of United States v. Texas's point, which is this is an immigration case, and Article 1, Section 8 puts Congress in the driver's seat and says there must be a uniform rule of naturalization. So I think for those reasons, you know, I get why the court might want to get into it. Getting into it here, I think, in the Supreme Court probably doesn't make a tremendous amount of sense. It'd almost be an advisory opinion. Our fundamental point to you, though, is that Congress is in the driver's seat when it comes to immigration and that this executive order transgresses the limits that every president has done with this proclamation power since 1918. And to accept it here is to accept that the president can take an iron wrecking ball to the statute and pick and choose things that he doesn't want for purposes of our immigration code. But that can't be the law of the United States. We'll take five extra minutes. Okay. You don't have to. If there are any other questions, I'm happy to take anything. Thank you. Thank you, counsel. Five minutes for rebuttal. General. Mr. Chief Justice, and may it please the Court, I really do have just a few quick points, unless Your Honors have additional questions. Justice Breyer, I did want to respond in more detail to your question about how the waiver process works. The State Department does publish the waiver process on its website, but the waiver process actually is applied automatically by consular officers. So when somebody applies for a visa, the waiver — the visa officer first determines whether the person is otherwise admissible under other provisions of the INA. If they're inadmissible, you never even get to the proclamation. Then, for those people who are not inadmissible under other parts of the INA, like 1182a, the consular officer then turns to the proclamation and first asks, are you subject to an exception within the proclamation? If you are, fine, and the proclamation never applies. If you're not subject to an exception, then the consular officer, him or herself, turns to the waiver provision and applies the criteria of the waiver provision. So it does get applied in every single case. How do you deal with the example that was brought up of the child with cerebral palsy? Your Honor, the waiver is built to address those issues. I am not familiar enough with the details of that case to tell you what happened in that particular case, but that's what the waiver provision is intended to address. You see, you've read the briefs, as have I. All right, now, there's some that lists about 10 or 15 instances, like the cerebral palsy, one is Parkinson's. Then there's another brief that lists all the people who are professors, scholars at universities, and there are a lot. And then there are people, they list the students from these countries, a lot. And then the business community lists a whole bunch and says, my goodness, they have been unable to get, we don't know what's going on. And then they say, well, what's going on is nothing is going on. Now, I don't, I'm not taking sides on that. I'm just saying I don't know. Right. And the principal purpose of the proclamation is, of course, to assert pressure on these countries in order to provide us with the needed information, which brings me to the second point in the four that I'm hoping to try to make, and that is that the individual vetting process depends upon us having the minimum baseline of information needed to determine in that vetting process whether the person is admissible. So when the person shows up at our border with a visa that we may have validly issued pursuant to that individual vetting process, but for whom government knows something that we don't and doesn't tell us, we cannot intelligently make the admissibility determination. Third, I'd like to address the 1152A1A point about nationality-based discrimination. Sotomayor, could you stop just one second? Yes, Your Honor. Of course. I, for one, am, like Justice Breyer, concerned about is this window dressing or not? What's in place to ensure it's not? What are you personally doing to represent to us that it is, in fact, a real waiver process? Your Honor, State Department consular officers automatically apply the waiver process in the course of every visa application, and they are doing that, which is why there have been, and I looked at our brief, 430 waivers that have been issued since the proclamation was issued. Have you bothered to look to see if there are reasons for all of those people's exclusions? Your Honor, I cannot claim that I have looked into every individual case. Could you make your 1152 point? Yes, Your Honor. 1152A1A addresses one thing, the issuance of immigrant visas. It doesn't address the broader question over whether somebody is allowed to enter in the first place. That's governed by 1182, including 1182F. So, essentially, 1182 sets the universe of people who are eligible to come into the country in the first place, and that is often a foreign policy and national security judgment. 1152A1A is one of the rules that governs how we distribute visas amongst that group that's eligible to come in. And it's not just nationality-based distinctions that it applies to. It also applies to things like place of residence. So once you have that universe of eligible people, 1152A1A governs how you distribute them. But let's assume that you disagreed with me. All it would really mean is that we have to implement this proclamation in a slightly different way. We would have to issue immigrant visas, but not nonimmigrant visas, to people who aren't allowed to enter. But we wouldn't have to allow anyone to enter, and we wouldn't have to issue any nonimmigrant visas. So the bottom line is I think they're simply wrong on that case, on that issue. My final point has to do with my brother's recognition that if the president were to say tomorrow that he was sorry, all of this would go away. Well, the president has made crystal clear on September 25th that he had no intention of imposing the Muslim ban. He has made crystal clear that Muslims in this country are great Americans, and there are many, many Muslim countries who love this country, and he has praised Islam as one of the great countries of the world. This proclamation is about what it says it's about, foreign policy and national security, and we would ask that you reverse the Court below. Thank you, Counsel. The case is submitted.